**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v. CRIMINAL ACTION NO. 5:08-cr-00103-01

TEDDY DEAN DAVIS,

Defendant.

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Teddy Dean Davis's Motion to Suppress Evidence [Docket 47]. By Order of Reference entered May 7, 2008, pretrial motions, including the pending motion, were designated for referral to United States Magistrate Judge R. Clarke VanDervort for submission of proposed findings and recommendations (PF&R) in accordance with 28 U.S.C. § 636(b)(1)(B). Magistrate Judge VanDervort held an evidentiary hearing on Defendant's motion on July 29, 2008, and filed his PF&R on October 9, 2008. In that filing, the magistrate judge recommended that this Court deny Defendant's suppression motion in its entirety.

The Court is not required to review, under a de novo or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to which no objections are addressed. *Thomas v. Arn*, 474 U.S. 140, 150 (1985). In addition, this Court need not conduct a de novo review when a party "makes general and conclusory objections that do not direct the Court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). Here, objections to

Magistrate Judge VanDervort's PF&R were due by October 27, 2008. Defendant filed timely objections to the PF&R on October 15, 2008.

## *I. BACKGROUND*

### *A. Factual Background*

The events preceding Defendant's arrest, which form the basis for his suppression motion, are subject to considerable dispute. Based on the averments of Defendant, the testimony at the July 29 hearing, and the findings of Magistrate Judge VanDervort, the relevant factual background is as follows.[1]

On April 10, 2008, Special Agent Michael A. Yansick of the Federal Bureau of Investigation (FBI) received a call from an agent in the FBI's Pittsburgh Division headquarters. The Pittsburgh agent informed Special Agent Yansick that a Kentucky resident reported that a person applied for a credit card using the Kentucky resident's name and that the address on the credit card application was room 107 of the Holiday Inn in Beckley, West Virginia. Special Agent Yansick contacted the Beckley Police Department and arranged to meet Corporal James H. Blume, III, at the Holiday Inn to investigate. Upon arriving at the hotel, Special Agent Yansick and Officer Blume spoke with the manager at the front desk. The manager showed them a copy of the room registration form. The form indicated that the room was rented in one name, but that the name had been changed thereafter to that of the Kentucky resident. The manager proceeded to escort Special Agent Yansick and Officer Blume to room 107. The officers knocked on the door and received no response. The manager opened the door for them and they entered the room announcing that they were police

[1] The factual background and testimony at the evidentiary hearing are set forth in greater detail in the PF&R.

officers. The officers' stated purpose for entering the room was to check for the presence of the suspects and to ensure that they were not destroying evidence.[2] The officers testified that they were in the room approximately ten to fifteen seconds and that no evidence was observed or seized at that time. The manager's testimony differed somewhat, and he estimated that the officers were in the room "three to five minutes at tops." (Tr. at 14.)[3] There is no indication from the manager's testimony that any evidence was taken on April 10. The officers left the room and informed the manager that they would return the following day.

The next day, April 11, Special Agent Yansick returned to the Holiday Inn accompanied by his partner, Special Agent Terry Schwartz, and Detectives Frank Priddy and Samuel L. McClure, Jr., of the Beckley Police Department. The officers went to the front desk and learned that the suspects continued to rent the room and were believed to be on the property at that time. The four officers proceeded to room 107. Special Agent Yansick knocked once. Detective Priddy knocked a second time much louder. From inside the room a voice asked, "Who is it?" Special Agent Yansick and Detective Priddy answered "FBI" and "Police," respectively. (Tr. at 37, 140.) Defendant opened the door slightly with the security latch engaged and asked the officers what they wanted. Special Agent Yansick and Detective Priddy showed Defendant their credentials and asked to come in and speak with Defendant. Defendant closed the door, disengaged the security latch, and

---

[2] Magistrate Judge VanDervort found that the April 10, 2008, warrantless entry into Defendant's hotel room was not supported by exigent circumstances and therefore was unconstitutional. (Docket 65 at 18.) Neither the government nor Defendant objected to this finding, apparently because no evidence was uncovered. Nonetheless, this Court cannot and does not condone this type of constitutional violation.

[3] The copy of the transcript available to the Court and cited herein is the court reporter's rough draft.

reopened the door. The officers then entered the room.[4]

What transpired immediately after the officers entered the suite differs in the accounts of the officers and Defendant. According to Defendant, Special Agent Yansick crossed the threshold and remained in the sitting room with Defendant. The three other officer immediately "went running to the back bedroom." (Tr. at 180.) Detective McClure allegedly had his firearm drawn. Defendant claims that the allegedly stolen and/or fraudulently obtained mail—the evidence Defendant seeks to suppress—was hidden in the hallway closet. Detective Priddy opened the closet twice, according to Defendant, removing the mail the second time. Defendant states that at no time did he consent to a search of the hotel suite until after the incriminating evidence had been discovered.

The officers' separate descriptions of their entry into the room were substantially similar. According to the officers, they entered the suite and Special Agent Yansick asked if there was anyone else in the hotel. Defendant acknowledged that there was a second person present and gestured toward the bedroom. At that point, Special Agent Schwartz and Detectives Priddy and McClure went to the back bedroom for the purpose of "officer safety"—that is, to ensure that the second suspect was not a threat. (Tr. at 112, 142.) The officers observed Brian Hoffman under a sheet in one of the room's two beds. He cooperated when they told him to show his hands. The officers all claim to have observed a blue canvas satchel and a trash can overflowing with mail at or near the foot of the bed occupied by Hoffman. The mail, which appeared to be addressed to many different people, was spilling out onto the floor. A computer also was observed at or near the foot

---

[4] The hotel room was a three-room suite. The first room was a sitting room where the officers initially encountered Defendant. Opposite the entrance and across the sitting room was a short hallway which led to a bedroom and bathroom. There were two beds in the bedroom. There was a closet in the hallway and one in the bedroom.

of the unoccupied bed.

The testimony given by the officers and Defendant are substantially similar as to other events that occurred shortly after the entry. Special Agent Yansick asked Defendant his name, and Defendant replied with the name of the Kentucky resident. Special Agent Yansick responded that he knew that to be false because he had spoken with the Kentucky resident earlier. Defendant responded by giving Special Agent Yansick another false name, that of his brother. Soon thereafter, Hoffman, still in the bedroom, told the officers that Defendant's name was Teddy Davis. Upon being confronted with his real name, Defendant admitted his identity. A search of National Crime Information Center records revealed that Defendant was the subject of an outstanding warrant from Oklahoma and that Oklahoma intended to extradite Defendant.

After learning of the outstanding warrant, the officers asked for Defendant and Hoffman's permission to search the suite and their automobile. Both consented. The subsequent searches produced no evidence, aside from the previously discovered mail and computer. Defendant was then placed under arrest for the fugitive warrant. He was read his Miranda rights at the police station and invoked his right to remain silent.

On June 3, 2008, a grand jury returned a superseding indictment against Defendant and Hoffman for events occurring between April 5 and April 11, 2008. The seven-count indictment charges both defendants with three counts of mail fraud in violation 18 U.S.C. §§ 1341; three counts of aggravated identity theft in violation of 18 U.S.C. §§ 1028A; and one count of possession of stolen mail in violation of 18 U.S.C. §§ 1708.

*B. Defendant's Suppression Motion*

Defendant's motion seeks the suppression of all phone logs, United States mail, credit card

applications, and other physical evidence seized from Defendant's hotel room on April 11, 2008. Defendant also moves for the suppression of the results of any forensic evaluation of the computer seized from the hotel room and of any United States mail delivered to the hotel room after April 11. Defendant asserts that the manner in which the evidence was obtained violated the Fourth Amendment in several respects. First, the phone log showing all outgoing calls from Defendant's hotel room was obtained on April 10, 2008, without a warrant. Second, Defendant maintains that the officers' search of Defendant's hotel suite on April 11, 2008, was unreasonable within the meaning of the Fourth Amendment because the officers had not obtained a warrant or consent for the search.[5] Lastly, Defendant argues that all evidence obtained subsequent to the April 11, 2008, entry into the hotel suite should be excluded under the fruit of the poisonous tree doctrine.

*II. DISCUSSION*

Defendant lodges four objections to the PF&R, all of which stem from the "Government['s] fail[ure] to present sufficient evidence to satisfy any of the established exceptions to the Fourth Amendment warrant requirement." (Docket 66 at 2.) Defendant first argues that he did not consent to the initial search of the hotel suite. Defendant's second objection asserts the officers' protective sweep of the suite was not justified because Defendant was not under arrest when the sweep occurred. In his third objection, Defendant maintains that Hoffman did not give the officers consent to search. Defendant's last objection states that all evidence seized subsequent to the allegedly unlawful search should be excluded under the fruit of the poisonous tree doctrine. Defendant asserts no objections relating to the phone log evidence seized on April 10, 2008.

---

[5] Defendant also states that the April 10, 2008, entry into Defendant's hotel suite was unlawful and that any evidence seized on that date should be suppressed. There is no indication that any evidence was seized from the suite on this date, however.

*A. Applicable Law*

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. This right restrains the power of law enforcement officers to conduct searches of places in which a person has a "legitimate expectation of privacy." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)). A person's subjective expectation of privacy does not constitute a legitimate expectation of privacy unless society is prepared to recognize the reasonableness of the expectation. *See id.* 142 n.3. Courts have consistently held that people have a legitimate expectation of privacy in rented hotel rooms. *See, e.g., Stoner v. California*, 376 U.S. 483, 490 (1964) (holding that warrantless search of hotel room based on consent of hotel clerk is unconstitutional); *United States v. Kitchens*, 113 F.3d 29, 31 (4th Cir. 1997); *United States v. Thomas*, 955 F.2d 207, 208 (4th Cir. 1992); *United States v. Arias*, 992 F. Supp. 832, 836 (S.D. W. Va. 1997).[6]

[6] The legitimacy of a person's expectation of privacy in a hotel room is diminished if the room was obtained by fraud—as it is alleged to have been in this case. *See United States v. Bruce*, 396 F.3d 697, 709 n.7 (6th Cir.2005) (noting that a defendant's use of an alias to obtain a hotel room lessened his privacy interest); *United States v. Cunag*, 386 F.3d 888, 894–95 (9th Cir. 2004) (stating that a person's privacy interest in a fraudulently obtained hotel room is diminished, but not extinguished until the hotel owner takes affirmative acts to evict the occupant); *United States v. Wai-Keung*, 845 F. Supp. 1548, 1562 (S.D. Fla. 1994) (finding no reasonable expectation of privacy where defendants obtained hotel room with stolen credit card); *c.f. Rakas*, 439 U.S. at 143 n.12 ("A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as 'legitimate.'"). However, it has not been established in the Fourth Circuit whether a person who has procured a hotel room by fraudulent means has a sufficient privacy interest to exclude law enforcement officers. The question of whether Defendant had a legitimate expectation of privacy in the hotel suite has not been adequately briefed and the Court need not decide it because the suppression motion may be disposed of on other grounds. Accordingly, the Court assumes, but does not decide, that Defendant had a legitimate expectation of privacy in his hotel suite.

A hotel occupant's privacy interest in the rented room does not preclude all law enforcement searches—it merely necessitates that those searches be reasonable. Warrantless searches are per se unreasonable unless the search falls within a valid exception. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Several long-standing exceptions are implicated in this case: searches based on consent, protective sweeps, and the plain view doctrine. For searches based on consent, law enforcement officers do not need a warrant to conduct a search if the subject of the search waives his Fourth Amendment rights and voluntarily consents to a search. *See id.* at 227; *Ferguson v. City of Charleston*, 308 F.3d 380, 296 (4th Cir. 2002). Regarding protective sweep searches, law enforcement officers do not violate the Fourth Amendment when they are lawfully on a premises and conduct a "quick and limited" search "confined to a cursory visual inspection of those places in which a person might be hiding" who may endanger the officers. *Maryland v. Buie*, 494 U.S. 325, 237 (1990). The plain view doctrine is not as much an independent exception to the warrant requirement as it is a complement to the exceptions. *See Arizona v. Hicks*, 480 U.S. 321, 325 (1987); *Illinois v. Andreas*, 463 U.S. 765, 771 (1983). Under the plain view doctrine, officers may seize incriminating evidence observed in plain view, provided that the officers' presence in the location is justified by a warrant or by a recognized warrant exception. *See Horton v. California*, 496 U.S. 128, 135 (1990); *United States v. Jackson,* 131 F.3d 1105, 1109 (4th Cir. 1997).

Because warrantless searches are presumably unlawful, the government bears the burden of proving that one of the valid exceptions applies to the circumstances. *See United States v. Jeffers*, 342 U.S. 48 ("[T]he burden is on those seeking the [warrant] exemption to show the need for it . . . ."); *see also United States v. Gwinn*, 219 F.3d 326, 335 (4th Cir. 2000); *United States v. Morrow*, 731 F.2d 233, 235–36 (4th Cir. 1984). It is axiomatic that the government need only demonstrate

the applicability of one warrant exception to justify a warrantless search. The showing of a valid warrant exception has important consequences for the government because a law enforcement officer's power to seize incriminating evidence in plain view is contingent on the officer's rightful presence in the locus. *See Horton*, 496 U.S. at 135.

The judicially fashioned remedy for Fourth Amendment violations is the exclusion of the unlawfully seized evidence from a defendant's trial. *See Hudson v. Michigan*, 547 U.S. 586, 590–91 (2006); *see also Mapp v. Ohio*, 367 U.S. 643, 655 (1961). To increase the deterrent effect of the exclusionary rule, evidence subsequently "obtained as a direct result of an unconstitutional search or seizure" is excluded from trial as "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)). Of course, evidence obtained by law enforcement officers after an identifiable Fourth Amendment violation has occurred is not excludable as fruit of the poisonous tree if the evidence had not been obtained "by exploitation of that illegality[, but] instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

*B. Defendant's Objections*

Although Defendant asserts four separate objections to Magistrate Judge VanDervort's PF&R, only one needs to be addressed in detail. The second objection states that the protective sweep conducted by the officers within moments of their entry into Defendant's hotel suite was not justified because the officers were in the room with Defendant's consent and Defendant was not yet in custody. As stated above, law enforcement officers need only demonstrate one applicable warrant exception to justify the seizure of evidence discovered in plain view. Thus, if a protective sweep that is justified and properly limited in scope reveals inculpatory evidence, it is immaterial that the

officers did not obtain consent to seize the items. For this reason, Defendant's first and third objections—each of which alleges a failure to obtain consent—are inconsequential if the protective sweep was valid. Likewise, a finding that the officers' actions on April 11, 2008, were lawful is determinative of Defendant's fourth objection that all subsequently obtained evidence should be excluded as fruit of the poisonous tree.

*1. Protective Sweep Objection: Relevant Law*

Notwithstanding the conflicting testimony regarding the details of the officers' entry into Defendant's hotel suite, it is undisputed that three of the officers conducted a protective sweep of the suite prior to Defendant's arrest. It is also agreed that the officers' entry into the suite was in response to Defendant's consent. Therefore, the question presented by Defendant's second objection is whether the officers' protective sweep was a reasonable search under the Fourth Amendment given that (1) it occurred prior to arrest, and (2) that the officers' presence in the suite was based on consent. Defendant argues that the protective sweep was unreasonable for each of these reasons.

The Supreme Court, in *Maryland v. Buie*, found that a protective sweep of a suspect's home may be reasonable under the Fourth Amendment in certain circumstances. 494 U.S. 325, 336–37 (1990). In *Buie*, law enforcement officers entered the defendant's home to execute an arrest warrant and found the defendant hiding in the basement. *Id*. at 238. Following the defendant's arrest, an officer entered the basement to ensure that no one else was hiding there. *Id*. Inculpatory evidence—a red running suit the defendant wore to commit an armed robbery—was observed lying on a stack of clothing and seized. *Id*.

The *Buie* opinion relied heavily on the reasoning in *Terry v. Ohio*, 392 U.S. 1 (1968), and

*Michigan v. Long*, 463, U.S. 1032 (1983). *Terry* announced the balancing test to be applied to determine if a particular law enforcement search is reasonable under the Fourth Amendment. *See Terry*, 392 U.S. at 21. The competing interests to be balanced are a suspected individual's right to be free from unwarranted invasions of his personal liberty and the need for law enforcement officers to protect themselves and others. *See id.* at 24. In order to strike the appropriate balance between these two interests, the *Terry* Court advised reviewing courts to apply an objective standard to challenged searches: "[W]ould the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id*. at 21–22. Stated simply, the standard is whether the officer had a reasonable articulable suspicion of a threat that justified the search. *Long* extended this principle to the passenger compartment of suspects' automobiles and *Buie* extended it suspects' homes. Thus, the Supreme Court held in *Buie*

> that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. This is no more and no less than was required in *Terry* and *Long*, and as in those cases, we think this balance is the proper one.

*Buie*, 494 U.S. at 334.

The facts of this case are distinguishable from *Buie* in that the officers in this case were in Defendant's hotel suite with his consent and that he was not under arrest at the time of the protective sweep. Defendant argues that *Buie*'s holding should be limited to protective sweeps conducted as part of searches incident to arrest. Several courts have addressed factual situations similar to the

case at bar in light of *Buie*, but the Fourth Circuit is not among them. Unsurprisingly, these authorities are split as to whether law enforcement actions similar to those in this case are reasonable. This may be due, in large part, to the inherently fact-based nature of the balancing test. The reasoning in these cases is instructive nonetheless.

The Eighth, Ninth, and Tenth Circuits have held that a protective sweep may be performed only as part of a search incident to arrest. *See United States v. Torres-Castro*, 470 F.3d 992, 997–98 (10th Cir. 2006); *United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005); *United States v. Reid*, 226 F.3d 1020, 1027 (9th Cir. 2000); *see also United States v. Walker*, 474 F.3d 1249, 1254 (10th Cir. 2007) (noting that a protective sweep not incident to arrest may be justified only by exigent circumstances). This rule has been relaxed somewhat, however, and courts have held that a protective sweep is permissible as a search incident to arrest if "a legitimate basis for the arrest existed before the search, and . . . the arrest followed shortly after the search." *Torres-Castro*, 470 F.3d at 998 (citation omitted).

Other courts have extended *Buie* protective sweeps to other non-arrest situations. The First Circuit has held that "police who have lawfully entered a residence possess the same right to conduct a protective sweep whether an arrest warrant, a search warrant, or the existence of exigent circumstances prompts their entry." *United States v. Martins*, 413 F.3d 139, 150 (1st Cir. 2005); *accord United States v. Legette*, 260 Fed. App'x 247, 249–50 (11th Cir. 2008) (unpublished); *United States v. Taylor*, 248 F.3d 506, 513 (6th Cir. 2001). In arriving at this holding, the First Circuit noted in *Martins* that "the key is the reasonableness of the belief that the officers' safety or the safety of others may be at risk." *Martins*, 413 F.3d at 150. Similarly, the Second Circuit has held that "specific, articulable facts giving rise to a reasonable inference of danger may justify a protective

sweep in circumstances other than during the in-home execution of an arrest warrant." *United States v. Miller*, 430 F.3d 93, 100 (2d Cir. 2005). The Fifth Circuit has recognized that non-arrest situations may pose a *greater* risk to law enforcement officers' safety because the suspect is not in custody. *United States v. Gould*, 364 F.3d 578, 584 (5th Cir. 2004) (citing *Long*, 463 U.S. at 1051). Thus, non-arrest law enforcement entries into premises "give rise to equally reasonable suspicion of equally serious risk of danger of officers being ambushed by a hidden person as would be the case were there an arrest." *Id*.

Among the courts that have permitted protective sweeps not incident to arrest, a common requirement is that the law enforcement officers must on the premises lawfully. This includes situations in which the officers have entered a home with the consent of the owner. *See, e.g.*, *Taylor*, 248 F.3d at 513. For example, in *United States v. Gould*, law enforcement officers went to a dangerous suspect's home without a warrant to conduct a "knock and talk" investigation. 364 F.3d at 590. A resident of the home invited the officers in and told them that the suspect was asleep in his bedroom. *Id*. at 580. The officers did not see the suspect in the bed and conducted a protective sweep of the room in order to locate the suspect. *Id*. In the process of looking under the bed and in two closets, rifles were discovered and seized. *Id*. The Fifth Circuit observed that although "protective sweeps following a consent entry may in certain circumstances pose Fourth Amendment concerns not present in cases where the initial entry is pursuant to a warrant," *Buie*'s reasonableness standard still applies to the officers' conduct. *Id.* at 589–90.

*2. Protective Sweep Objection: Analysis*

As a threshold matter, the Court is not persuaded by Defendant's argument that a protective sweep can be conducted only as part of a search incident to arrest. Based on the cases cited above,

it appears that Defendant's argument has been adopted by three courts of appeals,[7] but it has been rejected by at least five. In the absence of guidance from the Fourth Circuit, this Court is inclined to side with the weight of authority. Moreover, the courts that have rejected arguments similar to Defendant's are more in line with the Supreme Court's reasoning in *Buie*, *Terry*, and *Long*. The competing interests balanced by the *Buie* Court—a suspect's right to be free from unwarranted intrusions and law enforcement officers' safety—are no less present because a suspect is not under arrest. Obviously, a suspect's privacy interest is equally present whether he is being arrested or merely questioned by the police. Likewise, law enforcement officers may be at risk from unknown threats whether they are in a home to execute a search warrant or to speak with a suspect. As some courts have noted, *see, e.g.*, *Gould*, 364 F.3d at 584, law enforcement officers may, in certain circumstances, be at greater risk from hidden dangers where a suspect is not in custody; in such situations the officers may be preoccupied with the unrestrained and potentially dangerous suspect while undisclosed persons are planning an ambush elsewhere in the residence. Precluding officers from conducting protective sweeps of residences unless an arrest has occurred disregards the important officer safety interest recognized in *Terry* and its progeny without good reason, and such a rule could endanger law enforcement officers in some situations. Thus, the Court finds that a protective sweep that is not part of a search incident to arrest is not per se unreasonable. For the same reasons, a protective sweep is not unreasonable simply because the officers were invited into

[7] One of the three circuits with decisions that support Defendant's arguments, the Ninth, has had at least one panel adopt the contrary position. *Compare United States v. Reid*, 226 F.3d 1020 (9th Cir. 2000), *with United States v. Garcia*, 997 F.2d 1273 (9th Cir. 1993).

the residence.[8]

The Court, therefore, must balance Defendant's right to be free from unwarranted invasions into his privacy with the officers' need to protect themselves from unknown dangers in the hotel room. The Court assumes, for the purposes of adjudicating the pending motion, that Defendant had a sufficient privacy interest in the hotel suite to exclude the officers. *See supra* note 6. The determinative inquiry is whether the officers' protective sweep was justified by a reasonable articulable suspicion that a threat lurked elsewhere in the suite.

The government bears the burden "to articulate facts sufficient to support reasonable suspicion." *United States v. Burton*, 228 F.3d 524, 528 (4th Cir. 2000) (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983). After a careful de novo review of the transcript of the July 29 hearing, *see Wimmer v. Cook*, 774 F.2d 68, 76 (4th Cir. 1985), it is evident the government has met this burden. The four officers proceeded to Defendant's hotel room on April 11, 2008, knowing that the persons occupying the room were not who they claimed to be. The room was registered to a Kentucky resident who had reported to the FBI that he was vacationing in Florida at that time and that his credit card company informed him that a credit card in his name had been requested with the hotel listed as the address. Thus, the officers had reason to be believe that the hotel room was being used for criminal activity. The officers also were told by hotel staff that at least two suspects, both male, had been occupying the room and that both suspects likely were present in the room at the time the officers arrived to investigate.

---

[8] There are legitimate concerns raised by some courts and implied by Defendant, (Docket 66 at 6–7), that officers may gain entry to a suspect's home with consent and use a protective sweep as a pretext to conduct a warrantless search for evidence. However, a faithful application of *Buie*, *Terry*, and *Long*'s reasonable articulable suspicion standard to the officers' conduct should ferret out abusive uses of protective sweeps.

The testimony of all parties is consistent that a not insignificant period of time elapsed between the officers' first knock on the hotel door and their entry. Defendant then opened the door and allowed the officers to enter. The officers observed only Defendant in the sitting room. From their viewpoint upon entry, the officers could see into part of the bedroom, but they did not observe any other persons. Although the officers' testimonies vary slightly with regard to certain details, each officer indicated that Special Agent Yansick initiated conversation with Defendant. Defendant gave the name of the Kentucky resident when asked his name, which indicated to the officers that Defendant was attempting to deceive them. While Special Agent Yansick was speaking to Defendant, the three other officers were watching for other threats. Special Agent Schwartz testified:

> I wasn't paying attention to [Defendant] as much as . . . worrying about what was in the other danger areas in the room. There was a bathroom. There was a bedroom in the back. I was more concerned about what was in those areas . . . . I was worried about covering [the other officers'] backs.

(Tr. at 76.)

Shortly into the conversation, likely within half a minute of entry,[9] Special Agent Yansick asked if anyone else was in the suite. Defendant responded that his boyfriend was in the bedroom. Special Agent Schwartz and Detectives McClure and Priddy entered the short hallway leading to the bedroom and bathroom, both of which had open doors at the time. The officers looked into the bathroom and entered the bedroom. There they encountered Hoffman in the bed. They ordered Hoffman to show his hands, but did not otherwise physically restrain him. They began to question Hoffman at this time. The incriminating mail and computer were spotted in plain view in the

[9] Special Agent Yansick testified that "within the first thirty seconds or so Mr. Davis told us there was someone else in the back room and then we went back there." (Tr. at 54.)

bedroom. Until consent was given later, no closets or other containers were opened.

Special Agent Schwartz described the reason for the entry into the back bedroom as follows:

> [A]t that time, for my safety and everybody else's safety I proceeded to walk the ten feet or so into the bedroom, into the bathroom, looked into the bathroom. Nobody was in there. Then I walked into the bedroom . . . . I was worried about that other individual or individuals for my safety and my partner's safety. So I was wanting to get him in sight and see what type of individual or individuals were back in that room because I was, I was concerned. . . . [O]ver the years in this business I've had a lot of people jump out from closets, bathrooms, bedrooms, and attack me, you know. And being in a lot of training in that . . . if there's other individuals in the house when criminal activity is going on, we have to locate that person and at least control him. . . . Just, just eyeball them up, make sure that . . . they don't have any weapons on them so they're in your presence so you can see them, you can see their hand. You can see what they're up to.

(Tr. at 76–78.)

Detective McClure's testimony was similar: "Myself, Detective Priddy, and Agent Schwartz, we proceeded to go to the back of the suite basically for a protective search, officer safety." (Tr. at 112.) When asked why he responded to the bedroom, Detective Priddy stated, "You never want to take a risk on possibly getting someone hurt. I had no idea if . . . this other person, if they were in the corner, in the bed, if they had a gun, if they didn't have a gun." (Tr. at 142.)

In summary, the officers found themselves in a small, three-room hotel suite. They encountered one subject and believed that at least one more subject was in the room, but out of sight. A not insignificant time had elapsed between when they announced their presence at the door and when they entered the room—certainly enough time for the unseen subject or subjects to prepare an attack. The subject they encountered when they first entered the room, Defendant, was being deceptive about his identity. Defendant then informed them that another person, who was not visible, was in the suite. Although the officers were present on suspicion of identity theft and mail fraud, which are not crimes of violence, the officers had no prior knowledge of the subjects and had

no reason to know that they were not violent individuals. Thus, the officers' assertions that they believed that their safety necessitated a quick and cursory investigation of the other rooms of the suite are supported by reasonable articulable suspicion.

Furthermore, the officers' protective sweep was properly limited in scope. The officers looked into the bathroom, and finding no one, they proceeded into the bedroom. According to the officers' testimony, no closets were opened, nor were any containers opened during the sweep. The areas searched included only those areas in which a person might be hiding[10] and the officers' method of search was visual inspection.

Because the officers were justified in conducting a protective sweep, and because the sweep was properly limited in scope, any evidence observed during the sweep was subject to seizure. Upon entering the hotel bedroom, the officers observed U.S. mail resting in an open trash can and spilling out of an overfull satchel. The officers also spotted Defendant's computer resting on the bed. Consequently, these items of inculpatory evidence were properly seized under the plain view doctrine.

Defendant argues that the magistrate judge erred by crediting the officers' testimony over Defendant's. In Defendant's version of events, the officers immediately rushed into the back bedroom and opened the closet doors, where they found the inculpatory evidence. The Court has reviewed the record in this case throughly and can find no reason to disturb Magistrate Judge VanDervort's credibility determinations or factual findings. *See United States v. Raddatz*, 447 U.S. 667, 676 (1980) ("[I]n providing for a 'de novo determination' rather than a *de novo* hearing [in 28

---

[10] Even if Defendant's testimony was correct and the officers looked in the closets, the scope of the sweep would have been proper because protective sweeps include "those places in which a person might be hiding." *Buie*, 494 U.S. at 327.

U.S.C. 636(b)(1)], Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations."). The officers' testimony is consistent in all material respects and the differences are most likely attributable to minor defects in the officers' recollection. Moreover, none of the minor inconsistencies give this Court reason to doubt the veracity of the officers who testified. In contrast, there are reasons to doubt Defendant's credibility. For example, Defendant admitted to twice lying to the officers about his identity during the April 11 incident. (Tr. at 180.)

The Court **FINDS** that the officers were properly in the hotel room based on Defendant's consent; that their protective sweep was supported by reasonable articulable suspicion of a potential threat to their safety; that the scope of the protective sweep was properly limited; and that the evidence seized was in plain view. Accordingly, Defendant's second objection is **OVERRULED**.

3. *Remaining Objections*

For the reasons stated above, the evidence Defendant seeks to exclude was discovered pursuant to a valid protective sweep. It is immaterial that the officers did not first obtain Defendant or Hoffman's consent to search the hotel suite. Accordingly, Defendant's first and third objections are **OVERRULED**. The evidence seized on April 11, 2008, was obtained lawfully, and no subsequently obtained evidence is tainted as fruit of the poisonous tree. Defendant does not argue in his objections that the April 10 entry in his hotel room tainted the evidence seized on April 11 or acquired thereafter. Thus, Defendant's fourth objection is **OVERRULED**.

## *III. CONCLUSION*

The Court **ADOPTS** Magistrate Judge VanDervort's PF&R and **DENIES** Defendant's suppression motion [Docket 47].

**IT IS SO ORDERED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER: November 25, 2008

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE